**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | **ORDER ON MOTIONS** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 1:14-cr-239 |
| Ryan Keith Ironroad, | ) | |
| | ) | |
| Defendant. | ) | |

_____

The Defendant, Ryan Ironroad, has been charged in an indictment with one count of murder in violation of 18 U.S.C. §§ 1111 and 1153 and one count of assault with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3) and 1153. See Docket No. 13. On February 4, 2015, Ironroad filed a motion to suppress. See Docket No. 20. Ironroad contends he was subjected to a series of interrogations that were either custodial and without *Miranda* warnings or involuntary. Ironroad seeks suppression of all statements he made to law enforcement officers during these interviews. The Government filed a response in opposition to the motion on February 11, 2015. See Docket No. 25. Ironroad filed a reply brief on February 18, 2015. See Docket No. 26.

Ironroad filed a second motion to suppress on April 14, 2015. See Docket No. 30. In his second motion to suppress, Ironroad seeks to suppress voice identifications which he contends were impermissibly suggestive and unreliable. The Government filed a response in opposition to the motion on April 27, 2015. See Docket No. 36. Ironroad filed a reply brief on May 4, 2015. See Docket No. 38.

Ironroad filed a motion to compel production of fingerprint evidence on May 1, 2015. See Docket No. 37. The Government did not respond to the motion to compel.

1

Ironroad filed a motion to exclude expert testimony on May 9, 2015.  See Docket No. 40. The Government filed a response in opposition to the motion on May 15, 2015.  See Docket No. 54.

A hearing on all the motions was held on June 30, 2015.  For the reasons set forth below, the first motion to suppress and the motion to exclude expert testimony are denied.  The second motion to suppress and the motion to compel are granted.

## I.      BACKGROUND

Shortly after 11:00 p.m. on November 22, 2014, the Standing Rock Police Department received a 911 call from an individual at Sharon Many Wounds's residence at 198 Golden Eagle Avenue in Fort Yates, North Dakota.  The caller stated that an unknown male had entered the residence and stabbed another male at the home.  Officers were dispatched and arrived on scene at approximately 11:10 p.m.

Upon arriving, the officers observed an adult male lying on the floor of the living room area of the residence and several large pools of what appeared to be blood.  A safety sweep of the residence was conducted.  Two witnesses to the incident were located and identified as Duane His Chase and Todd Lebeau.  Lebeau was heavily intoxicated.  Both men gave statements to law enforcement officers.

In their statements His Chase and Lebeau indicated an unknown adult male came into the residence uninvited.  The unknown male was dressed in dark clothing, wore a dark hooded sweatshirt with the hood up and a mask over his face, and was carrying a long bladed knife.  The unknown male demanded money.  His Chase, Lebeau, and the victim, Clay Hagel, believed the unknown male was joking, so they did not react.  The unknown male then swung his knife towards

His Chase, hitting His Chase's coffee cup. In response, Hagel began to push the unknown male towards the door and out of the residence when a scuffle broke out. As the unknown male left the residence, he told His Chase and Lebeau to "call the cops." Shortly thereafter, Hagel collapsed to the floor with stab wounds to his abdomen and upper left arm. Hagel was transported to Bismarck, North Dakota, for emergency medical treatment. On November 23, 2014, Hagel died from his wounds.

The case was investigated by Bureau of Indian Affairs ("BIA") Special Agents Micah Ware and Derek Wichita, who focused on twenty-six (26) year old Ryan Ironroad as their prime suspect. BIA Special Agents Ware and Wichita interviewed Ironroad five times between November 26, 2014, and December 11, 2014. Audio recordings were made of all five interviews. Throughout all the interviews, Ironroad maintained he was innocent and attempted to provide an explanation as to his whereabouts on the night in question.

The first interview occurred on November 26, 2014. The interview, which was conducted by BIA Special Agents Ware and Wichita, took place in a BIA police vehicle outside the home of Ironroad's mother, Beverly Ironroad. Prior to being questioned, the agents frisked Ironroad and found a knife on his person. The agents informed Ironroad he was not under arrest and would not be arrested that day, that he was free to leave at any time, and the interview was completely voluntary. No *Miranda* warning was given. Ironroad was not handcuffed or restrained at any time during the interview and the doors to the vehicle were unlocked. The interview lasted approximately one hour and six minutes. At the conclusion of the interview, Ironroad left the vehicle and was not arrested.

The second interview occurred on December 1, 2014. This interview took place at the

Standing Rock Police Station in Fort Yates, North Dakota.  BIA Special Agents Ware and Wichita provided Ironroad with a ride from Cannonball, North Dakota, where Ironroad lives, to the police station in Fort Yates.  Fort Yates Police Chief David Lawrence participated in the interview along with BIA Special Agents Ware and Wichita.  Prior to the interview, Ironroad was informed the interview was voluntary, he was not under arrest, the agents had no intention of arresting him, the door to the room was unlocked, and he was free to leave at any time.  Ironroad was not given *Miranda* warnings.  The interview lasted approximately ninety-one (91) minutes.  Ironroad was not arrested at the conclusion of the interview, which ended when he got up and left the police station.

The third interview occurred on December 3, 2014.  BIA Special Agent Wichita conducted the interview at the Standing Rock Police Station in Fort Yates, North Dakota.  BIA Special Agent Wichita provided Ironroad transportation to the police station.  No *Miranda* warnings were given.  A polygraph examination was to be conducted as part of the interview, but Ironroad changed his mind and abruptly got up and left.  He was not arrested.  The entire encounter was very brief.  The recording made at the police station was less than one minute in length.

The fourth interview occurred on December 10, 2014, when Ironroad was arrested in Cannonball, North Dakota, on a federal complaint charging him with felony murder and assault with a dangerous weapon in relation to the death on Clay Hagel.  Ironroad was informed of his *Miranda* rights.  While being transported to the Fort Yates jail by Special Agents Ware and Wichita, Ironroad made several unsolicited statements.  The agents did not question Ironroad at this time but did respond to some of his statements.  The recording of the interview lasts approximately thirty-five (35) minutes.

The fifth interview occurred on December 11, 2014.  The interview was conducted by BIA

Special Agents Ware and Wichita, as well as Fort Yates Police Chief Dave Lawrence, at the police station in Fort Yates, North Dakota, just prior to transporting Ironroad to Bismarck, North Dakota, for his initial appearance in federal court.  Ironroad was informed of his *Miranda* rights prior to the interview and he signed an advice of rights form.  Approximately fifteen (15) minutes into the interview, Ironroad got upset and requested they proceed to Bismarck for the initial appearance.  The officers ended their questioning immediately, placed Ironroad in a vehicle, and began the journey to Bismarck.  During the one hour and fifteen minute ride to Bismarck, Ironroad made several spontaneous statements to BIA Special Agents Ware and Wichita.

In addition to the interviews of Ironroad, BIA Special Agent Ware conducted voice identification interviews with His Chase and Lebeau.  After listening to one voice exemplar, both men identified the individual on the recording as the person who assaulted Clay Hagel.  No recording of the voice identification procedures were made.

On December 3, 2014, BIA Special Agent Ware interviewed Lebeau.  Lebeau was under the influence of alcohol at the time, having consumed several shots of vodka prior to the interview.  Agent Ware asked Lebeau to listen to a short portion of an audio recording in order to see if he recognized the voice.  Agent Ware did not identify the voice in the twenty-five (25) second recording he played for Lebeau.  The recording itself did not identify the speaker.  The speaker sounded agitated in the recording.  Both Lebeau and His Chase had indicated that the perpetrator was agitated when he demanded money on the night of the assault.  Lebeau listened to the audio recording twice.  When Lebeau first heard the recording, he began to cry and stated "that sounds like the voice."  Agent Ware then asked Lebeau on a scale of 1 to 100, how sure he was.  Lebeau responded he was 100% sure that the voice on the recording was the same person who assaulted

Clay Hagel.

On December 4, 2014, BIA Special Agent Ware met with His Chase and asked him to listen to the same short audio recording he had played for Lebeau. BIA Special Agent Ware again did not identify who was on the audio recording, and played for His Chase the same twenty-five (25) second audio recording. BIA Special Agent Ware did not inform His Chase he had met with Lebeau the day before, nor did he indicate that Lebeau had identified the voice on the recording as the perpetrator of the stabbing. His Chase listened to the audio recording three times. He then stated to Agent Ware the person on the recording was the person who assaulted Hagel. His Chase elaborated further that when he first heard the voice it "shook him." Agent Ware asked how sure he was of the voice matching the perpetrator of the assault and again offered a scale of 1 to 100. His Chase, like Lebeau, indicated he was 100% sure of the match.

## II.     LEGAL DISCUSSION

### A.     CUSTODY UNDER MIRANDA

Ironroad contends the interviews he participated in on November 26, 2014, December 1, 2014, and December 3, 2014, were custodial in nature and were conducted without the benefit of *Miranda* warnings. He asks that the statements made during these interviews be suppressed. The Government contends the interviews were not custodial in nature and thus no *Miranda* warnings were required.

It is well-established that law enforcement officers must administer *Miranda* warnings whenever a suspect is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda v. Arizona, 384 U.S. 436, 478-79

(1966).  The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination and the right to the assistance of an attorney when an individual is taken into custody for questioning.  United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990)).  Accordingly, *Miranda* requires that law enforcement officers advise an individual as to the availability of this privilege against self-incrimination and to the assistance of counsel when the individual is interrogated while in custody.  Id.

For purposes of *Miranda*, an individual is in custody when he is either formally arrested or his freedom of movement is constrained to a degree equivalent with formal arrest.  United States v. Brave Heart, 397 F.3d 1035, 1038 (8th Cir. 2005).  The *Miranda* custody test is objective and requires two discrete inquiries:  (1) what were the circumstances surrounding the interrogation, and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave.  Yarborough v. Alvarado, 541 U.S. 652, 663 (2004) (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  In Berkemer v. McCarty, the United States Supreme Court affirmed that an objective test is preferable to a subjective test because under the objective analysis the police do not have the burden of anticipating the frailties or idiosyncrasies of every person whom they question.  468 U.S. 420, 442 (1984).

As outlined in *Griffin*, it is well-established in the Eighth Circuit Court of Appeals that the totality of circumstances must be analyzed, and the following six factors are to be considered in determining whether an individual was held in custody:

(1)     whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest;

(2)     whether the suspect possessed unrestrained freedom of movement during questioning;

(3)     whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities;

(4)     whether strong arm tactics or deceptive stratagems were employed during questioning;

(5)     whether there was a police-dominated atmosphere; and

(6)     whether the suspect was placed under arrest at the termination of the questioning.

922 F.2d at 1349; United States v. Rainbow, 380 F. Supp. 2d 1071, 1075 (D.N.D. 2005).  "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning.  Conversely, the last three indicia are aggravating factors which if present, aggravate the existence of custody . . . these six indicia of custody are representative and are not exclusive."  United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002).

The Eighth Circuit does not require the *Griffin* test be followed ritualistically in every *Miranda* case.  United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004).  "When the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  Id.  The most obvious way to demonstrate a person is not in custody is to tell him he is not in custody and he may terminate the questioning at any time.  Id. at 826; see United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005).  To determine whether a defendant was in custody at the time of the questioning, the Court must consider the *Griffin* factors as well as the totality of the circumstances that confronted him at the time of questioning.

### 1.     NOVEMBER 26, 2014, INTERVIEW

This interview took place in a BIA police vehicle outside the home of Ironroad's mother,

Beverly Ironroad.  Prior to being questioned, officers frisked Ironroad and found a knife on his person.  The officers informed Ironroad he was not under arrest and would not be arrested that day, he was free to leave at any time, and the interview was completely voluntary.  Ironroad was not handcuffed or restrained at any time during the interview and the doors to the vehicle were unlocked.  The interview lasted approximately one hour and six minutes.  At the conclusion of the interview, Inronroad left the vehicle and was not arrested.

The *Griffin* factors weigh heavily in favor of a finding that Ironroad was not in custody during the interview.  He was not restrained in any way during the interview, the vehicle was unlocked, and he was not arrested at the conclusion of the interview  Although the encounter took place in a police vehicle, the vehicle was unlocked and any deceptions employed were minor and are part and parcel of police interrogations.  See United States v. LeBrun, 363 F.3d 715, 721 (8th Cir. 2004) (finding interrogation was no custodial where questioning took place at a police station and psychological ploys were employed the coercive aspects of a police interview are largely irrelevant if a reasonable person would feel free to leave).  Based on a careful consideration of the *Griffin* factors and an analysis of the totality of the circumstances, the Court finds the Defendant was not in custody when he was interviewed on November 26, 2014.

### 2.    DECEMBER 1, 2014, INTERVIEW

The second interview took place at the Standing Rock Police Station in Fort Yates, North Dakota. Special Agents Ware and Wichita provided Ironroad with a ride to from Cannonball, North Dakota, where Ironroad lives, to the police station in Fort Yates.  Fort Yates Police Chief David Lawrence participated in the interview along with Special Agents Ware and Wichita.  Prior to the

interview, Ironroad was informed by the officers that the interview was voluntary, he was not under arrest, and the officers had no intention of arresting him. Ironroad was also informed the door to the room was unlocked and he was free to leave at any time. The interview lasted approximately ninety-one (91) minutes. Ironroad was not arrested at the conclusion of the interview, which ended when he got up and left the police station.

As the Court has already noted, the lack of an arrest is a very important factor weighing against a finding of custody, and a station house interrogation does not negate the lack of arrest. LeBrun, 363 F.3d at 721-22. Officers informed Ironroad the interview was voluntary. Ironroad was not handcuffed or otherwise restrained. While the interview occurred at the police station, even questioning at FBI headquarters behind locked doors has been found to be non-custodial. United States v. Mottl, 946 F.2d 1366, 1367 (8th Cir. 1991). Ironroad clearly did not feel restrained because he ended the interview and left the police station without being arrested when he grew frustrated with the questioning. Based on careful consideration of the *Griffin* factors, as well as an analysis of the totality of the circumstances, the Court finds the Defendant was not in custody when he was interviewed on December 1, 2014.

### 3.    DECEMBER 3, 2014, INTERVIEW

The third interview was conducted at the Standing Rock Police Station in Fort Yates, North Dakota, by BIA Special Agent Wichita. BIA Special Agent Wichita provided Ironroad transportation to the police station. A polygraph examination was to be conducted as part of the interview, but Ironroad changed his mind and abruptly left the police station. He was not arrested. The entire encounter was very brief. The recording of the interview lasts only forty-nine seconds.

The record does not reveal that any incriminating statements were made during this encounter. Most telling is the interrogation ended when Ironroad left the police station. He was not arrested. Based on an analysis of the *Griffin* factors and the totality of the circumstances, the Court finds the Defendant was not in custody when he was briefly interviewed on December 3, 2014.

### B.      VOLUNTARINESS OF STATEMENTS

Ironroad contends the statements he made to law enforcement officers at the interviews conducted on December 10, 2014, and December 11, 2014, were involuntary. Both interviews were conducted after officers gave Ironroad *Miranda* warnings. The Government contends the interviews were voluntary.

"A conviction based on an involuntary confession, obtained through police coercion, violates the Due Process Clause." United States v. Carroll, 207 F.3d 465, 472 (8th Cir. 2000). A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the suspect's will and critically impair his capacity for self-determination are used. Brave Heart, 397 F.3d at 1040. A statement is also involuntary if it was extracted through the use of physical or psychological pressure. United States v. Bordeaux, 400 F.3d 548, 560 (8th Cir. 2005). The government must prove by a preponderance of the evidence that the defendant's statements were voluntary. Brave Heart, 397 F.3d at 1040 (citing LeBrun, 363 F.3d at 724). Whether a statement is involuntary is determined by the totality of the circumstances. Lebrun, 363 F.3d at 724. In making such a judgment the court must consider the conduct of the law enforcement officials and the characteristics of the defendant. Id.

### 1.   DECEMBER 10, 2014, INTERVIEW

On December 10, 2014, Ironroad was arrested in Cannonball, North Dakota, on a federal complaint charging him with felony murder and assault with a dangerous weapon in relation to the death on Clay Hagel.  Ironroad was informed of his *Miranda* rights immediately after his arrest. While being transported to the Fort Yates jail by BIA Special Agents Ware and Wichita, Ironroad made several unsolicited statements.  The agents did not question Ironroad at this time but did respond to some of his statements.  The recording of the interview lasts approximately thirty-five (35) minutes.  The record reveals that nothing about this encounter suggests the Defendant's unsolicited statements were the product of coercion.  Lebrun, 363 F.3d at 724 (officer conduct and the characteristics of the accused must be considered in making a voluntariness determination). Ironroad was 26-years old at the time he was interviewed and had a number of prior criminal convictions in both state and tribal court.  There is no indication he did not understand his rights under *Miranda.*  He maintained his innocence throughout the interview.  All discussions between Ironroad and Special Agents Ware and Wichita were initiated by Ironroad.  Ironroad's will was clearly not overborne.  Based upon the totality of the circumstances, the Court finds the statements were voluntary.  The Court further finds that the Government has met its burden of proof and established the Defendant's statements were voluntary.

### 2.   DECEMBER 11, 2014, INTERVIEW

This interview was conducted by BIA Special Agents Ware and Wichita, and Fort Yates Police Chief Dave Lawrence, just prior to transporting Ironroad to Bismarck, North Dakota, for his initial appearance in federal court.  Ironroad was informed of his *Miranda* rights prior to the

interview and he signed an advice of rights form. When Ironroad asked when he would get a lawyer, the officers told him he would get one that same day at his initial appearance. Davis v. United States, 512 U.S. 452, 462 (1994) (finding police officers have no obligation to stop questioning in response to an ambiguous or equivocal request for counsel). Ironroad then agreed to talk to the officers. Approximately fifteen (15) minutes into the interview Ironroad got upset, stated he needed a lawyer but could wait until they got to Bismarck, and requested they leave immediately. The officers ended their questioning at this time. Ironroad made several spontaneous statements during the transport to federal court in Bismarck. These statements were not made in response to questioning. Spontaneous statements that are not made in response to police questioning cannot be considered involuntary. See United States v. Ochoa-Gonzalez, 598 F.3d 1033, 1039 (8th Cir. 2010). Based upon the totality of the circumstances, the Court finds the statements by Ironroad on December 11, 2014, were voluntary. In addition, the Court finds the Government has shown, by a preponderance of the evidence, that the statements made by Ironroad were voluntary.

### C.   <u>VOICE IDENTIFICATION</u>

Ironroad contends the voice identification procedures used by law enforcement officers on December 3, 2014, and December 4, 2014, were impermissibly suggestive and created a substantial likelihood of misidentification. Ironroad requests that any voice identification testimony be suppressed. The Government maintains the procedures used were not impermissibly suggestive and suppression is unwarranted.

In general, identification testimony from a person who has witnessed a crime is admissible and it is for the jury to assess the credibility of the witness and the worthiness of the testimony.

Sanchell v. Parratt, 530 F.2d 286, 292 (8th Cir. 1976). However, when police arranged identification procedures raise doubts as to the reliability of the testimony, a defendant's due process rights are implicated. Perry v. New Hampshire, 132 S. Ct. 716, 723 (2012). "Limits on the admissibility of identification testimony which may have been influenced by governmental suggestion are mandated by the Sixth Amendment right to counsel clause and the due process clauses of the Fifth and Fourteenth Amendments." Sanchell, 530 F.2d at 292. It is the likelihood of misidentification which violates a defendant's due process rights. Neil v. Biggers, 409 U.S. 188, 198 (1972).

Courts employ a two-step analysis when a defendant challenges a police arranged out-of-court identification procedure. Perry, 132 S. Ct. at 724. First, the court must determine whether the procedure was impermissibly suggestive and, if so, whether it was so suggestive as to raise a very substantial likelihood of misidentification. Biggers, 409 U.S. at 198; United States v. Wilson, 787 F.2d 375, 385 (8th Cir. 1986). Second, if the procedure was unnecessarily suggestive, the court must determine whether, under the totality of the circumstances, the identification was independently reliable. Manson v. Brathwaite, 432 U.S. 98, 114 (1977); United States v. Pickar, 616 F.3d 821, 827 (8th Cir. 2010). Factors to be considered in evaluating a witness' ability to make an accurate identification include: (1) the opportunity of the witness to hear the accused at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the accused; (4) the level of certainty demonstrated at the identification; and (5) the time between the crime and identification. Pickar, 616 F.3d at 827 (citing Brathwaite, 432 U.S. at 114). "Reliability is the linchpin" of the evaluation. Brathwaite, 432 U.S. at 114. Only when the indicators of a witness' ability to make a reliable identification are outweighed by the corrupting effect of an unduly

suggestive law enforcement identification procedure should the evidence be suppressed. Perry, 132 S. Ct. at 725.

Most of the case law in the area of police-arranged identification deals with eyewitness identification. While voice identification is clearly different from eyewitness identification, the test established by the United States Supreme Court in the *Biggers* and *Brathwaite* is easily adaptable and equally applicable to voice identification cases, and provides a standardized source of guidance to courts for assessing the reliability of all types of identification procedures. See Gov't of Virgin Islands v. Sanes, 57 F.3d 338, 340 (3d Cir. 1995) (finding the test used in *Biggers* and *Brathwaite* applies to voice identification testimony); see also United States v. Chandler, 17 M.J. 678, 681 (A.C.M.R. 1983) (applying the standard set forth in *Biggers* and *Brathwaite* to voice identification testimony); Long v. Dutton, 621 F. Supp. 1209, 1213 (M.D. Tenn. 1985) (applying *Biggers* to voice identification testimony).

The Government's reliance on Rule 901(b)(5) of the Federal Rules of Evidence as the standard for admissibility of the voice identifications is misplaced. Rule 901(b)(5) applies when voice recordings are offered into evidence and a witness offers an opinion as to the identity of a person heard on the recording. See United States v. Smith, 635 F.2d 716, 718 (8th Cir. 1980) (government introduced tape recordings); United States v. Cerone, 830 F.2d 938, 949 (8th Cir. 1987) (government offered several tape recorded telephone calls). The present case does not involve the authentication of a voice recording, but rather the admissibility of identification evidence and whether the procedures used by law enforcement officials raise due process concerns. For example, if this were a case where Lebeau or His Chase were familiar with the assailant's voice based on prior encounters with the person and could identify the assailant based on those encounters, Rule

15

901(b)(5) would apply and it would simply be a matter for jury to judge the accuracy of the identification.  But where the defendant challenges the identification procedures by which law enforcement presented the defendant's voice to witnesses of an event, the two-step test set forth by the United States Supreme Court in *Biggers* and *Brathwaite* needs to be applied.

### 1.    SUGGESTIVENESS

It is well-established in the Eighth Circuit that single suspect showups and single photograph arrays are impermissibly suggestive.  Sanchell v. Parratt, 530 F.2d 286, 294 (8th Cir. 1976) (describing the showing of a single suspect to a witness as the most suggestive and most objectionable method of pretrial identification); United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991) (noting a single photograph array is considered impermissibly suggestive); United States v. Patterson, 20 F.3d 801, 806 (8th Cir. 1994) (finding it improper to use single photograph displays with eyewitnesses).  While the present case involves the use of a single voice exemplar rather than a single photograph, the Court has no trouble concluding such a procedure is impermissibly suggestive.  See Palmer v. Peyton, 359 F.2d 199, 201 (4th Cir. 1966) (finding voice identification procedures to be especially suggestive when the witness is given no alternative choices).  A proper voice lineup would include a minimum of five fillers repeating the same utterance spoken by the perpetrator at the time of the crime and the entire procedure should be recorded.  See Docket No. 31-1, pp. 6-7; see also Simmons v. United States, 390 U.S. 377, 383 (1968) (stressing pictures of a number of individuals must be shown in a photographic lineup); Chandler, 17 M.J. at 681 (approving of a voice lineup with five fillers).

In addition, the voice exemplar itself is overly suggestive because the recording contained

not only Ironroad's voice, but BIA Special Agent Ware's voice questioning Ironroad.  Ironroad is clearly agitated by the line of questioning regarding a possible polygraph examination.  The clear implication from the exemplar used was that the person speaking on the recording was the main suspect in the assault.  In addition, no attempt was made to have Ironroad repeat anything uttered by the perpetrator on the night of the assault.  The single exemplar and the nature of the exemplar itself leads the Court to conclude the procedures used were extremely suggestive and raise a very substantial likelihood of misidentification.


### 2. RELIABILITY

Reliability is the linchpin of determining the admissibility of identification testimony. Brathwaite, 432 U.S. at 114.  Applying the factors set out in *Biggers*, the Court concludes the indicia of reliability do not outweigh the corrupting effect of the unduly suggestive voice identification procedures  that were employed.


### a. Opportunity to Hear the Accused at the Time of the Crime

The first factor to be considered in evaluating a witness' ability to make an accurate identification is the opportunity of the witness to hear the accused at the time of the crime.  Pickar, 616 F.3d at 827.  When interviewed after the assault, His Chase described the perpetrator's voice as someone from the Standing Rock area, and Lebeau described the voice as high-pitched.  Both men described the perpetrator as young and hyped up.  His Chase also described the perpetrator as tall and skinny.  The perpetrator's face was covered by a mask and his voice was, to some degree, muffled by the mask.  No estimate of length of the encounter was made by the witnesses.  However,

it is clear the encounter was very brief and only a few sentences were uttered by the perpetrator. The opportunity to hear the perpetrator's voice was limited.

### b.    The Witness' Degree of Attention

The second factor to be considered in evaluating a witness' ability to make an accurate identification is the witness' degree of attention. Pickar, 616 F.3d at 827. It is undisputed that Lebeau was heavily intoxicated on the night of the assault. More importantly, Lebeau was also under the influence of alcohol at the time he listened to the recording in BIA Special Agent Ware's vehicle and identified the voice as that of the perpetrator. These facts alone, are enough to warrant suppression of his identification, particularly when one also considers the extremely suggestive nature of the voice identification procedure used.

Both witnesses, His Chase and Lebeau, were asked to recall their impression of a stranger's voice during a brief encounter in the emotionally-charged context of an armed assault. See United States v. Dobbs, 449 F.3d 904, 909-10 (8th Cir. 2006) (noting that when a witness is asked to identify a stranger in the context or an armed burglary the reliability of the identification lessens the likelihood of a reliable identification); United States v. Omar, 786 F.3d 1104, 1110 (8th Cir. 2015) (same). Such an encounter is clearly a very stressful experience which affects one's ability to accurately recall the incident.

In addition, the perpetrator swung a large knife at His Chase and broke the coffee cup he was holding in his hand. Arguably, both His Chase and Lebeau were primarily focused on the knife during the brief encounter rather than the perpetrator's voice. The Court finds this factor weighs against a reliable identification.

### c.      Accuracy of the Witness' Prior Description of the Accused

The third factor to be considered in evaluating a witness' ability to make an accurate identification is the accuracy of his prior description of the accused. Pickar, 616 F.3d at 827. His Chase and Lebeau gave a very limited description of the perpetrator's voice, describing it only as young, high pitched, and with a Standing Rock accent. This factor is of limited applicability in the context of a voice identification where an objective comparison is not possible.

### d.      Level of Certainty

The fourth factor to be considered in evaluating a witness' ability to make an accurate identification is the level of certainty demonstrated at the identification. Pickar, 616 F.3d at 827. Both men claimed they were 100% certain the voice they listened to was the person who fatally stabbed Clay Hagel. This level of certainty would support a finding that the identification is reliable. However, the Court does not find the level of certainty surprising given the highly suggestive voice identification procedures that were employed.

### e.      Time

The fifth factor to be considered in evaluating a witness' ability to make an accurate identification is the time between the crime and the identification. Pickar, 616 F.3d at 827. The assault occurred on November 22, 2014. Lebeau listened to the audio recording of Ironroad's voice on December 3, 2014, eleven days after the assault. His Chase listened to the recording on December 4, 2014, twelve days after the assault. As the voice identifications were made with two weeks of the assault, the passage of time arguably did not affect the identification.

19

The Court finds that based upon the totality of the circumstances, the extremely and unduly suggestive nature of the voice identification procedures employed outweigh the ability of the witnesses to make a reliable identification.  The presentation of only a single voice as part of the voice identification procedures, an undeniably critical point in the investigation, deprives the defendant of the "most elementary safeguards of the law" and destroys "the possibility of an objective judgment." Perry, 359 F.2d at 202.  the Court concludes that suppression is necessary to protect Ironroad's due process rights..

### D.    MOTION TO COMPEL

Citing Rules 12(b) and 16(a)(1)(F) of the Federal Rules of Criminal Procedure, Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v.United States, 405 U.S. 150 (1972), Ironroad seeks an order from the Court compelling the Government to produce test results of bloody fingerprints found at the crime scene.  The Government did not respond to the motion.  The Court deems the failure to respond an admission that the motion is well-taken.  See D.N.D. Crim. L.R. 47.1(E).  The Government must comply with its obligation under *Brady* and *Giglio*.

### III.    CONCLUSION

The Court has carefully reviewed the entire record including the audio recordings, the parties' arguments, the evidence presented at the suppression hearing, and the relevant case law.  For the reasons outlined above, Ironroad's first motion to suppress (Docket No. 20 ) is **DENIED** and his second motion suppress (Docket No. 30) is **GRANTED**.  Ironroad's motion to compel (Docket No. 37) is **GRANTED**.  Ironroad's motion to exclude expert testimony (Docket No. 40) is **DENIED** as

moot.

**IT IS SO ORDERED**.

Dated this 14th day of July, 2015.

/s/ Daniel L. Hovland
Daniel L. Hovland, District Judge
United States District Court